WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Starr Indemnity & Liability Company, et al., | No. CV-14-02100-TUC-BGM |
| Plaintiffs, | **ORDER** |
| v. | |
| Rolls-Royce Corporation, et al., | |
| Defendants. | |

Currently pending before the Court is Plaintiffs Starr Indemnity and Liability Company and Med-Trans Corporation's Motion to Determine Applicable Law (Doc. 31). Defendant Rolls-Royce Corporation has filed its Response (Doc. 41), and Plaintiff replied (Doc. 44). Oral argument was held on October 1, 2015. *See* Minute Entry 10/1/2015 (Doc. 61).

## I.      FACTUAL BACKGROUND[1]

This case arises from a helicopter crash near Aberdeen, South Dakota on April 12,

---

[1] Details regarding the April 12, 2012 incident and the issues raised by this lawsuit, for purposes of this Order only, are derived from Plaintiffs' Complaint.

2012.  Compl. (Doc. 1-1) at ¶¶ 6–8.  At the time of the crash, the helicopter was equipped with a Rolls Royce 250-C47B turbine engine.  *Id.* at ¶ 9.  A post-accident examination of the helicopter revealed internal damage to the engine, including two blades from the third stage turbine wheel had cracked due to fatigue and separated, as well as four other blades had evidence of fatigue cracks.  *Id.* at ¶ 10.  Plaintiffs believe that the accident was caused by design and/or manufacturing defects of the engine, turbine wheel blades, manuals, bulletins, notices, and directives.  *Id.* at ¶ 11.

Plaintiffs allege claims for 1) strict liability; 2) negligence; and 3) breach of express and/or implied warranty.  *See* Compl. (Doc 1-1) ¶¶ 17–39.  Plaintiffs' Complaint (Doc. 1-1) seeks damages for the aircraft which was destroyed, as well as for injuries sustained by the pilot.[2]  Compl. (Doc. 1-1) ¶¶ 8, 15.  Plaintiffs' current motion seeks a determination regarding the substantive law to be applied in this cause of action.

## II.    STANDARD OF REVIEW

In diversity cases, federal courts must follow the conflict of laws rules prevailing in the state in which it sits.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1947); *see also Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).  "Arizona courts apply the principles of the Restatement (Second) of Conflict of Laws (1971) to analyze and solve conflicts problems arising in Arizona."  *Bryant v. Silverman*, 146 Ariz. 41, 42, 703 P.2d 1190, 1191 (1985)

---

[2] Plaintiffs' Motion to Determine Applicable Law (Doc. 31) indicates that the pilot's injuries "were subsequently resolved through a worker's compensation claim and are not a part of this suit."  Pls.' Mot. to Determine Applicable Law (Doc. 31) at 2.

(en banc); *see also Bates v. Superior Court of State of Ariz.*, 156 Ariz. 46, 48, 749 P.2d 1367, 1369 (Ariz. 1988).

"The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement (Second) Conflict of Laws §145(1).    Section 145(2), Restatement (Second) Conflict of Laws, directs consideration of the following:

> (a)   the place where the injury occurred;

> (b)   the place where the conduct causing the injury occurred;

> (c)   the domicil, residence, nationality, place of incorporation and place of business of the parties; and

> (d)   the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.* Furthermore, "the inquiry is qualitative, not quantitative."  *Bates*, 156 Ariz. at 49. Additionally, the Section 145(2) factors are to be considered with a view to the following relevant policy considerations:

> (a)   the needs of the interstate and international systems;

> (b)   the relevant policies of the forum;

> (c)   the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

> (d)   the protection of justified expectations;

(e)   the basic policies underlying the particular field of law;

(f)   certainty, predictability, and uniformity of result; and

(g)   ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2).

## III.   ANALYSIS

As an initial matter, Plaintiffs asserted at oral argument that there is no conflict of law requiring this Court to select anything other than the forum law, because the law of Arizona and Texas are the same.   Hr'g Tr. 10/1/2015 (Doc. 65) 4:17–22, 5:20–6:20. Plaintiffs also asserted at oral argument that "there is no contract."   Hr'g Tr. 10/1/2015 (Doc. 65).   Defendants agree that Plaintiff did not purchase the engine from directly from Rolls-Royce.   Defs.' Response (Doc. 41) at 10.   It appears that Plaintiff Med-Trans purchased a new helicopter on which the engine was installed.   Lougheed Depo. Tr. 4/24/2015 (Doc. 41-1) 77:17–80:24.   In light of the fact that Plaintiffs filed the Motion to Determine Applicable Law (Doc. 31) at issue in this case, and the motion was never withdrawn, the Court finds that it is appropriate to perform a choice of law analysis as originally sought – "because there is likely a conflict on the issue of whether Plaintiffs can recover the economic loss sustained from the crash in tort rather than through contract remedies."   Pls.' Mot. to Determine Applicable Law (Doc. 31) at 6.

### A.   *Most Significant Relationship*

"Which forum's law applies to a particular issue depends on which forum has the

- 4 -

most significant relationship to the issue." *Garcia v. Gen. Motors Corp.*, 195 Ariz. 510, 516, 990 P.2d 1069, 1075 (Ct. App. 1999). "Our analysis starts with the four contacts specified in § 145(2), which will be taken into account in applying the principles enunciated in § 6 in ultimately determining whether Arizona or [Texas] has the 'most significant relationship' to the occurrence and the parties" *Bryant v. Silverman*, 146 Ariz. 41, 44, 703 P.2d 1190, 1193 (1985). Because this test is qualitative and not quantitative, "[w]e must determine . . . the weight to be given each contact in light of the issues and facts of this case." *Id.* at 45, 703 P.2d at 1194 (citations omitted); *see also Bates v. Superior Ct. of State of Ariz.*, 156 Ariz. 46, 49, 749 P.2d 1367, 1370 (1988) (evaluation of contact "according to their relative importance with respect to the particular issue").

## 1. Place Where the Injury Occurred

Plaintiffs' injury occurred when the engine allegedly failed causing the helicopter crash in South Dakota. *See e.g., Bryant v. Silverman*, 146 Ariz. 41, 44, 703 P.2d 1190, 1193 (1985) (plane crash in which the place where the injury occurred was found to be Colorado, where the crash took place); *see also Garcia v. Gen. Motors Corp.*, 195 Ariz. 510, 517, 990 P.2d 1069, 1076 (finding the Parties' relationship centered in Arizona). The economic loss resulting from Defendant's alleged conduct occurred in Arizona or Texas. *See e.g., Bates*, 156 Ariz. at 49, 749 P.2d at 1370 (insurance bad faith claim where plaintiff's mental, physical, and financial injuries occurred in her home state of Arizona); *Bobbitt v. Milberg, LLP* 285 F.R.D. 424 (D. Ariz. 2012) (legal malpractice class action finding economic loss occurred where the absent class members who suffered the loss were located). The Court will discuss Med-Trans Corporation's

principal place of business below; however, broadly speaking the Court finds that the place of injury includes South Dakota, Arizona, and Texas.

### 2. Where the Conduct Causing the Injury Occurred

"The location of the second contact, the place of the conduct causing the injury, is unclear." *Bryant*, 146 Ariz. at 44, 703 P.2d at 1193. Plaintiffs speculate that "because the defective part of the engine was likely manufactured in either Indiana or Virginia, these states are probably the place where the negligent conduct occurred." Pls.' Mot. to Determine Applicable Law (Doc. 31) at 11. Defendants further assert that "this contact is inapplicable here." Defs.' Response (Doc. 41) at 10.

### 3. Parties' Place of Business

Plaintiffs assert that because Plaintiff Med-Trans's Principal Base of Operations for Federal Aviation Administration ("FAA") purposes is Tucson, Arizona, Arizona has the most significant relationship. Pl.'s Mot. to Determine Applicable Law (Doc. 31) at 10. Defendants argue that Plaintiff Med-Trans's principal place of business is Lewisville, Texas and that its Principal Base of Operations is irrelevant to this analysis. Defs.' Response (Doc. 41) at 8.

The Supreme Court of the United States has defined "principal place of business," in the diversity jurisdiction context, as "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80, 130 S.Ct. 1181, 1186, 175 L.Ed.2d 1029 (2010). "Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its

constituent parts and from which its officers direct, control and coordinate all activities without regard to locale in furtherance of the corporate objective." *Id.* at 89–90, 130 S.Ct. at 1191 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F.Supp. 862, 865 (S.D.N.Y. 1959)).  The "nerve center" may or may not be a company's headquarters. *Hertz*, 559 U.S. at 93, 130 S.Ct. at 1192.

Plaintiff Med-Trans's quality assurance manager, Leslie Lougheed, was deposed pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, for the limited purpose of obtaining information relevant to the conflict of laws question.  *See* Lougheed Depo. Tr. 4/24/2015 (Doc. 41-1) 64:17–21.  American Medical Group Holdings ("AMGH") is a holding company and parent company of Med-Trans.  *Id.* at 11:6–20, 54:19–3.  Mr. Lougheed, as quality assurance manager, lives in Knoxville, Tennessee, but has an office in Tucson, Arizona. *Id.* at 6:15–20, 18:20–19:9.  Mr. Lougheed works remotely when he is not physically present in Tucson.  *Id.* at 18:20–19:9.  Mr. Lougheed described his position as "work[ing] as a liaison with the FAA, the director of maintenance, to ensure that Med-Trans is in compliance with all federal aviation regulations, . . . oversee[ing] all the aircraft records[,] . . . aircraft time life items[,] . . . over[seeing] . . . all overhaul specs and all engines, and so on, and so forth[,] [a]nd . . . look[ing] after Sky Track[,] . . . [and] other general duties." *Id.* at 17:20–18:6.

Med-Trans operates sixty-nine (69) aircraft across the United States in approximately fifty-six (56) programs.  Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 33:5–17.  Bert Levesque is Med-Trans's director of operations and is based in Tucson.  *Id.* at 37:8–38:10.  Mr. Levesque is the final decision maker to determine whether a pilot is

qualified or an airplane can lift off the ground. *Id.* at 39:20–40:11. Mr. Levesque reports to Brian Foster, the Vice President of Operations, who is located in the corporate office in Texas. *Id.* at 41:15–19, 46:14–16, 142:6–11. Mr. Levesque, however, is the only person who can give permission for flights to take off, none of the Texas officers or directors have the necessary qualifications. *Id.* at 144:18–147:2. As such, operational control is based in Tucson, Arizona. Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 165:3–8. Martin Arkus, Director of Program Support, is based in Tucson at St. Mary's Hospital. *Id.* at 47:1–48:8. Med-Trans's Principal Operations Inspector for the FAA is located in Scottsdale, Arizona. *Id.* at 54:13–18. The Tucson office also evaluates all job applicants seeking work with Med-Trans including drug testing, stores pilot training records, and maintains all aircraft records including maintenance records, as well as compliance records. *Id.* at 37:8–39:9, 53:22–54:12, 165:9–17, 169:5–23. Employment files are initiated in Tucson, but later transferred to the HR Director in Texas. *Id.* at 137:3–9, 165:9–17, 167:16–24. Flight training records and overseeing maintenance are activities performed out of the Tucson office. Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 140:4–21. Sky Track, the computer program which monitors where each Med-Trans aircraft is located, as well as other flight information, is managed out of the Tucson office. *Id.* at 165:22–167:6.

Fred Buttrell is the CEO of AMGH and located in Texas. *Id.* at 43:24–44:21. Mr. Buttrell was the CEO of Med-Trans previously; however, he is no longer part of Med-Trans. *Id.* Rob Hamilton is currently the CEO of Med-Trans, and is also located in Texas. *Id.* at 44:4–45:11. Philip Devasia, the current CFO for Med-Trans, is also located

in Texas.  Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 45:6–46:3.  Josh Brannon, the Director of Maintenance, lives in South Carolina with an office in Texas.  *Id.* at 48:9–12, 161:15–17.  Deborah Henkes, Director of Human Resources, is located in Texas.  *Id.* at 48:13–16.  K.C. Jones, Director of Clinical Services, lives and works in Chattanooga, Tennessee.  *Id.* at 49:1–8.  Jana Williams, Vice President of Partner Development, is located someplace other than either Texas or Arizona.  *Id.* at 49:9–14.  David Carr, Director of Safety, is located in Texas.  *Id.* at 49:15–16.  Thomas Cook, General Counsel, is located in Missouri.  Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 57:9–18.  Corporate books, income statements, and balance sheets are created and maintained in the Lewisville, Texas office.  *Id.* at 53:6–13.  Med-Trans's "[f]inance, billing, purchase acquisitions, and so on and [] so forth, tend to muddle together under an umbrella" with AMGH.  *Id.* at 60:19–61:4. Ultimately, billing goes through the Texas corporate office. *Id.* at 147:22–148:6.  Med-Trans website indicates that it is based in Lewisville, Texas. *See* Defs.' Response (Doc. 41), Exhs. "1" & "2."

Additionally, each program maintains four pilots and 1.5 mechanics per aircraft at the location of the aircraft.  Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 71:5–16.  New-hire pilot training is also done all over the country.  *Id.* at 102:11–19, 105:14–22.  Plaintiffs asserted at oral argument that the insurance policy which covered this loss insured Med-Trans.  Hr'g Tr. 10/1/2015 (Doc. 65) at 11:9–18.  Mr. Lougheed's testimony suggests that the insurance policy insured AMGH with Med-Trans as a co-holder and covered all of Med-Trans's helicopters.  Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 107:6–108:5.  It is clear, however, that AMGH is not a party to the current lawsuit.  *See*

Compl. (Doc. 1-1).

Defendants argue that Med-Trans's Tucson office as the "principle base of operations" is purely a regulatory construct. Hr'g Tr. 10/1/2015 (Doc. 65) at 21:17–25. Indeed the money flows to AMGH in Texas; however, the Court finds it compelling that Mr. Levesque is the only person in either Med-Trans or AMGH with the authority, as well as the necessary certification, to determine whether or not a flight can take off. Lougheed Depo. Tr. 4/25/2015 (Doc. 41-1) 144:18–147:2. Although corporate directors can ground operations, none of them have the necessary authority to give a flight the green light to take off. *See id.* This is central to the business of Med-Trans. Furthermore, all of the aircraft across the country are monitored from the Tucson office. *See id.* at 165:22–167:6. Although AMGH bankrolls Med-Trans's activities in Tucson and around the country, the Court finds that the "nerve center" of Med-Trans's operations are in Tucson, Arizona.

As to the other parties in this lawsuit, Plaintiff Starr Indemnity and Liability Company is incorporated in Texas and has its principal place of business in New York. Compl. (Doc. 1-1) ¶ 2. This contact is insignificant, however, because "[w]here an insured contracts with a third party requiring the latter to pay for loss or damage to insured property, upon payment of the loss the insurer is subrogated to the rights of the insured under the contract." *Highlands Ins. Co. v. Fischer*, 122 Ariz. 394, 396, 595 P.2d 186, 188 (Ct. App. 1979) (citing Couch on Insurance (Second) Sec. 61:144 (1966)); *see also Twin City Fire Ins. Co. v. Superior Court of State of Ariz. In & For Cty. of Maricopa*, 164 Ariz. 295, 296, 792 P.2d 758, 759 (1990) ("Under equitable subrogation,

the excess carrier steps into the shoes of the insured and gains all the rights of the insured"). Defendant Rolls-Royce Corporation is a Delaware corporation, with its principal place of business in Indiana. Compl. (Doc. 1-1) at ¶ 3. Defendant Rolls-Royce North America, Inc. is a Delaware corporation, with its principal place of business in Virginia, and has been dismissed from this lawsuit pursuant to stipulation of the parties. Compl. (Doc. 1-1) at ¶ 3; Order 7/17/2015 (Doc. 46). Defendant Rolls-Royce does business in every state, including both Texas and Arizona.

### 4. Parties' Relationship Center

The parties agree that this factor is inapplicable, because Plaintiff did not purchase the allegedly defective engine directly from Defendants. *See* Pl.'s Mot. for Determination of Applicable Law (Doc. 31) at 12; Defs.' Response (Doc. 41) at 10.

### 5. Weight of Factors

Factors two (2) and four (4) are inconclusive or otherwise inapplicable. Factor one (1), although initially pointed to South Dakota, Arizona or Texas, in light of the Court's analysis of factor three (3) now leans in favor of Arizona, as does factor three (3). This, however, does not end the Court's inquiry.

### B.   *Section 6 Policies*

"The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the occurrence and the parties." Restatement (Second) Conflict of Laws § 145, cmt. b. "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." *Id.* § 6, cmt. f.

## 1. Needs of the interstate system

"Probably the most important function of choice-of-law rules is to make the interstate and international systems work well."  Restatement (Second) Conflict of Laws § 6, cmt. d.  "Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them."  *Id.*  Plaintiff argues that "application of Arizona's products liability law would fully compensate a party whose flight operations are centered in Arizona and deter the wrongful conduct of manufacturers who sell faulty parts to companies who fly through Arizona's and other states' air space."  Pls.' Mot. to Determine Applicable Law (Doc. 31) at 14–15.   Defendants assert that "Plaintiffs' conclusory statement that Arizona law applies to this case more so than another state's laws when it had nothing to do with the operation of the helicopter, the crash, or Med-Trans' economic loss has no support."  Defs.' Response (Doc. 41) at 10.

In support of their argument, Plaintiffs point to *Bryant v. Silverman*, 146 Ariz. 41, 703 P.2d 1190 (1985) in which the Arizona Supreme Court recognized that "[a]pplication of Arizona damage law allowing unlimited compensatory and punitive damages would fully compensate the Arizona plaintiffs and would deter the wrongful conduct of Sun West or other Arizona based airlines in Arizona and other states' air space."  *Bryant*, 146 Ariz. at 46, 703 P.2d at 1195.   Here, however, the issue is whether Defendants, an Indiana corporation, should be held liable for an accident caused by an allegedly defectively designed and/or manufactured engine.   The Court finds that "the needs of the interstate system will not be significantly hindered or advanced by the application of

either [Arizona or Texas] law." *Garcia v. General Motors Corp.*, 195 Ariz. 510, 518, 990 P.2d 1069, 1077 (1999) (plaintiffs brought suit against car manufacturer for alleged design defects).

## 2. Relevant policies

In Arizona, "[t]he principal public policy underlying the economic loss rule recognizes 'that contract law and tort law each protect distinct interests.'" *Evans v. Singer*, 518 F.Supp.2d 1135 (D. Ariz. 2007) (quoting *Carstens v. City of Phoenix*, 206 Ariz. 123, 75 P.3d 1081, 1084 (Ct. App. 2003)). "The rationale for making a distinction is that traditional contract remedies are designed to redress loss of the benefit of the bargain while tort remedies are designed to protect the public from dangerous products." *Salt River Project Agr. Imp. and Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 376, 694 P.2d 198, 206 (1984) (citations omitted); *see also Flagstaff Affordable Housing Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 223 P.3d 664 (2010). "[T]he burden of accidental injuries caused by products intended for consumption should be placed on those who market them[,] . . . [because] merchants and manufacturers have the capacity to internalize the costs of accidental losses and distribute them among the many consumers who purchase their products." *Salt River Project*, 143 Ariz. at 375, 694 P.2d at 205.

"A basic policy of contract law, on the other hand, is to preserve freedom of contract and thus promote the free flow of commerce." *Id.* at 376, 694 P.2d at 206 (citing UCC § 1-102, official cmt. 2. In Texas, "[t]he economic loss rule was initially formulated to set perimeters in product liability cases." *Sharyland Water Supply Corp. v.*

*City of Alton*, 354 S.W.3d. 407, 415 (Tex. 2011) (citations omitted).  The *Sharyland court* further noted that "the UCC protect[s] manufacturers from 'unlimited and unforeseeable liability' for economic losses and that its implied warranties [a]re the means by which a consumer should seek redress for economic losses caused by a product defect."  *Id.* at 416.

Here, both parties acknowledge that there is no privity of contract.  *See* Hr'g Tr. 10/1/2015 (Doc. 65);  Defs.' Response (Doc. 41) at 10.  Furthermore, the damage was not limited to the allegedly defective engine alone, but included "substantial damage to the aircraft."  Defs.' Response (Doc. 41), Sworn Statement in Proof of Loss (Exh. "8") at 1. The Arizona Supreme Court in adopting a case-by-case analysis for the application of tort law or commercial law or a combination thereof, recognized that "[b]y unanimous authority . . . [where a] defect was unreasonably dangerous to person or property and caused accidental damage to other property" damages are recoverable in a strict tort liability action."  *Salt River Project*, 143 Ariz. at 378, 694 P.2d at 209.  The Texas Supreme Court has described "the economic loss rule [as] appl[ying] when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself."  *Sharyland Water Supply Co. v. City of Alton*, 354 S.W.3d at 416.  The *Sharyland* court went on to discuss  its holding in *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex. 1978).  In that case, the Texas Supreme Court "rejected a strict product liability theory in favor of an implied warranty action under the UCC, because Curry's economic loss (damage to the plane itself) was 'merely loss of value resulting from a failure of the product to perform according to the

contractual bargain and therefore is governed by the Uniform Commercial Code.'" *Sharyland Water Supply Corp.*, 354 S.W.3d at 416.   In *Mid Continent Aircraft*, the defendant "sold a reconditioned and overhauled single engine spray plane to the plaintiff" in an "as is" sale.   *Mid Continent Aircraft Corp.*, 572 S.W.2d at 309.   "The crash stemmed from [defendant's] failure to attach a small crankshaft gear bolt lock plate when the engine was overhauled."   *Id.* at 310.   Implicit to the *Mid Continent Aircraft* court's decision was a determination that the purchase was for the entire aircraft.   The Texas Supreme Court recognized that it had "distinguished cases involving personal injury or damage to property other than the product itself, noting that those damages could be recovered under strict liability theories."   *Sharyland Water Supply Corp.*, 354 S.W.3d at 416–17; *cf. Held v. Mitsubishi Aircraft Intern., Inc.*, 672 F.Supp. 369, 378–79 (Minnesota District Court recognized that under Texas law, the defendant designer and manufacturer of the airplane, who was not a party to the sales contract, and therefore without privity with the plaintiffs, could be sued for a breach of implied warranty for economic loss, as well as negligence).

Although Texas courts have applied the economic loss rule even to parties not in privity, it has not applied the rule where "the product was unreasonably dangerous to [plaintiff] or caused physical harm to [plaintiff] or his property."   *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 80 (Tex. 1977).   As such, Texas's policy goals of protecting manufacturers from "unlimited and unforeseeable liability" do not extend to those who place dangerous products in the stream of commerce.   Therefore, Arizona and

Texas policies appear to coincide.[3]   Moreover, application of Arizona's case-by-case approach provides an opportunity to further each state's goals by declining a bright-line approach.

### 3. Justified expectations

Defendants sell their products throughout the United States, and as such can expect that they may be subject to liability if the product fails.  *See Heoller v. Riverside Resort Hotel*, 169 Ariz. 452, 456–57, 820 P.2d 316, 320–21 (1991) (casino advertised in major urban centers all over the country and its proximity to Arizona should lead to the conclusion that it may be held accountable under law other than the State of Nevada); *see also Bryant v. Silverman*, 146 Ariz. 41, 46, 703 P.2d 1190, 1195 (1985) (finding protection of justified expectations of little importance because where the crash occurred could not be predicted).  Similarly, in light of Plaintiffs' national operation, they could not have an expectation regarding which law would apply.  As such, the Court finds this factor of less importance.

### 4. Certainty, predictability, and uniformity

Defendants argue that Arizona is merely the forum state, without more, and as such this factor "militates against applying Arizona law."  Defs.' Response (Doc. 41) at 11.  As an initial matter, Arizona's ties to this litigation are greater than being the site of trial.  Furthermore, the alleged failure of Defendants' engine was not a planned event, and as such the parties were "[un]likely to give advance thought to the legal

---

[3] To be clear, the Court is not making a decision that Defendant sold a dangerous product. Rather its current comments are based upon Plaintiffs' claims as alleged in their Complaint.

consequences of their transactions[.]" *Bryant*, 146 Ariz. at 46, 703 P.2d at 1195; *see also*

*Garcia*, 195 Ariz. at 518, 990 P.2d at 1077.  As such, the Court finds that this factor is

"largely irrelevant." *Bryant*, 146 Ariz. at 46, 703 P.2d at 1195.

**5. Ease of determination and application**

The Court finds that a jury could apply either Texas or Arizona law with equal

ease.  Neither state's law offers a bright-line rule for application based on the facts

presented in this case, and as such neither state's law is more easily determined or

applied.

**C.     Conclusion**

After consideration of the factors delineated in Sections 145 and 6, Restatement

(Second) Conflicts of Law, the Court finds that Arizona law should apply.  Arizona is the

"nerve-center" for Plaintiff Med-Trans's nationwide operation and Arizona law will best

protect the policy interests of Plaintiffs receiving full compensation for their alleged loss,

as well as allow for the protection of Defendants' interest against unlimited liability.


Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion to Determine

Applicable Law (Doc. 31) is GRANTED.  Arizona law shall apply to this cause of action.

Dated this 25th day of March, 2016.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge